UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-335 (RJL) |
| | : | |
| v. | : | |
| | : | |
| AMARO GONCALVES, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR AN EVIDENTIARY
HEARING FOR THE PURPOSE OF OBTAINING EXCULPATORY EVIDENCE

DENIS J. McINERNEY
Chief, Fraud Section

LAURA N. PERKINS
JOEY LIPTON
AMANDA AIKMAN
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20530

RONALD C. MACHEN JR.
United States Attorney

MATTHEW C. SOLOMON
JONATHAN HARAY
Assistant United States Attorneys
Fraud & Public Corruption Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Argument Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Exculpatory Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Entrapment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      Outrageous Government Conduct and Inherent Supervisory Powers . . . . . . . . . 3

        D.      Spoliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The Gabon Deal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      The "Critical Periods" Identified By the Defendants . . . . . . . . . . . . . . . . . . . 11

                1.      Defendants Mishkin and Alvirez's Conversations with
                        Bistrong on June 25, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.      Defendant Caldwell's Conversations with Bistrong in October 2009 . . . 14

        C.      The Reception and Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      An Evidentiary Hearing is Unwarranted on the Issue of Exculpatory Material . . . . . . . 23

II.     An Evidentiary Hearing is Unwarranted on the Issue of Entrapment . . . . . . . . . . . . . . 26

III.    An Evidentiary Hearing is Unwarranted on the Issue of Outrageous
        Government Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.     An Evidentiary Hearing is Unwarranted on the Issue of Inherent
        Supervisory Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.      An Evidentiary Hearing is Unwarranted on the Issue of Spoliation . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-335 (RJL) |
| | : | |
| v. | : | |
| | : | |
| AMARO GONCALVES, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR AN EVIDENTIARY
HEARING FOR THE PURPOSE OF OBTAINING EXCULPATORY EVIDENCE

The United States of America, by and through its undersigned attorneys, submits this

response to the defendants' motion for an evidentiary hearing to elicit testimony of cooperating

witness Richard Bistrong and the Federal Bureau of Investigation agents who supervised him

regarding any instructions or direction, including text messages, the agents communicated to

Bistrong that would be exculpatory and/or relevant to a pretrial motion to dismiss the indictment

based on entrapment, outrageous government conduct, the inherent supervisory powers of the

court, and spoliation of evidence.  As set forth below, a pretrial evidentiary hearing is not

warranted under the circumstances.

INTRODUCTION

I.     Overview

In order to persuade the Court to take the extraordinary step of permitting what amounts

to pretrial depositions of the government's anticipated trial witnesses, the defendants have

presented the Court with selective and misleading facts about this case.  By doing so, the

defendants have greatly overstated the merits of any pretrial motion to dismiss that they may file.

As they clearly recognize, there is overwhelming precedent counseling against pretrial resolution

of factual issues, and they face onerous legal standards in seeking to dismiss the indictment

before trial.

To set the record straight, and to enable the Court to rule with proper context that the defendants are not entitled to an evidentiary hearing because they already have the evidence to support their anticipated motions, the government sets forth below certain evidence showing that – at a minimum – there are numerous contested fact-bound issues that simply cannot be resolved pretrial.  Moreover, the government has now produced thousands of text messages between the FBI agents and Bistrong to supplement the actual recordings in this case.[1]  While the defendants can attempt to use these communications as impeachment evidence at trial, communications between the case agents and a cooperating witness in no way bolster the defendants' claim that they need an evidentiary hearing to fully develop their pretrial motions.

The defendants already have, and have had for months, the best evidence in support of their motions: the recorded conversations between Bistrong and the defendants.  For these reasons, as explained more fully below, the defendants have failed to show how an evidentiary hearing would ripen any entrapment motion and have failed to show how any additional information could aid in their other anticipated motions.

II.    <u>Argument Summary</u>

A.    <u>Exculpatory Material</u>.  The defendants are not entitled to an evidentiary hearing to ferret out speculative beliefs that undisclosed exculpatory material may exist in the communications between the FBI agents and Bistrong.  The government, in complying with its

---

[1]    The text messages were produced to the defendants on the same day as the filing of this response.  Due to the length of time it took to search for and retrieve the text messages, the volume of the recovered text messages, and the process to review them, the government was unable to produce them sooner.

discovery obligations, has now produced thousands of text messages, which contain likely impeachment value for use at trial. The relevant facts that control the need for an evidentiary hearing are not the text messages or other communications between the FBI agents and Bistrong, but rather the recorded conversations between Bistrong and the defendants. Because the defendants are well-aware and poised to take advantage of those conversations they are not entitled to special dispensation in the form of a pretrial evidentiary hearing.

B.    Entrapment.  The defendants are not entitled to an evidentiary hearing to discover additional facts related to entrapment. Entrapment is an issue for the jury after hearing all of the evidence. For the Court to make even the baseline determination that the defendants are entitled to an entrapment instruction, it would have to delve into the factual circumstances of each defendant to determine subjective intent. As numerous courts have recognized, such an inquiry cannot be accomplished pretrial without resort to time-consuming and fact-intensive mini-trials. That is why no court here or elsewhere has ever dismissed a case pretrial on the basis of entrapment on remotely analogous facts.

C.    Outrageous Government Conduct and Inherent Supervisory Powers.  An evidentiary hearing is unwarranted on the issue of outrageous government conduct. The defendants already have the best evidence to support any claim of outrageous government conduct: the recordings between Bistrong and the defendants. The defendants cite no law, because there is none, entitling them to conduct pretrial depositions of prospective government witnesses. Nor have they shown how communications between the FBI agents and Bistrong could conceivable support pretrial dismissal based on government conduct that "shocks the conscious," where they cannot articulate any actionable outrageous conduct based on the

3

evidence.  For the same reasons, the defendants will be unable to show constitutional or statutory violations implicating the Court's supervisory powers justifying dismissal, and the defendants' conclusory allegations to the contrary provide no basis for the Court to authorize a pretrial evidentiary hearing.

D.      Spoliation.  The Court should not permit additional pretrial fact-finding on the issue of spoliation.  To obtain pretrial dismissal on that issue, the Court would have to find that the government intentionally destroyed evidence that it knew to be exculpatory at the time, in bad faith, and that the defendants have no alternative means to demonstrate their innocence.  The existing record disproves any such allegation.  The government has recovered and disclosed the very text messages the defendants assert will form the basis for their spoliation motion, so the defendants will be unable to demonstrate any of the required elements for the extraordinary and unprecedented relief they seek.  The one case the defendants cite for pretrial exploration of these issues does not support their entitlement to a pretrial hearing because the court there ruled only that missing text messages between FBI agents and a cooperating witness constituted Jencks, not exculpatory Brady material, and the court only considered potential relief for the defendants at the conclusion of the trial.

FACTUAL BACKGROUND

I.      The Investigation

In June 2007, Richard Bistrong began cooperating with law enforcement by admitting to his own criminal conduct, including paying bribes to foreign government officials for the purpose of obtaining and retaining business for the company where he worked, and agreeing to cooperate against others in the military and law enforcement products industry who had engaged in and were continuing to engage in similar conduct.  Bistrong's cooperation proceeded in three

4

phases.  In the first phase, Bistrong worked with the government to identify individuals in the military and law enforcement products industry who were involved in paying bribes to foreign government officials, and recorded conversations with those individuals to obtain evidence of those individuals' previous illicit conduct.

For example, Bistrong recorded a conversation with defendants Mark Morales and Daniel Alvirez, in which Morales described to Bistrong and Alvirez how he used a "scope of work" to hide bribes to government officials.  (Recording 1D Nos. 91 and 101 (audio).[2])  Morales stated "nobody wants to violate the FCPA, so we'll start there, but everybody knows it happens."  (Id.)  Morales explained how he is careful and creative about how he structures payments to sales agents who give at least part of their payments to government officials, and cautioned that "you just gotta be smarter than the government."  (Id.)  Additionally, Bistrong recorded a conversation with defendant Yochanan Cohen in which Cohen discussed a deal he had done in Peru that involved payments to Peruvian generals.  (See Recording 1D No. 215 (audio).)  When Cohen explained the financials on that deal, Bistrong stated that "there are a lot of happy generals in Peru I think," to which Cohen responded, "I don't care. [laughing] . . . I, I don't care about it.  I just paid everything."  (Id.)

In the second phase of his cooperation, Bistrong worked with the individuals involved in the first phase and their business associates on real deals that involved paying bribes to foreign government officials.  For example, Bistrong worked with defendants Ofer Paz, Morales, John Gregory Godsey, and Alvirez on a deal involving the sale of Humvees to the Republic of

---

[2]       This meeting and the other meetings cited herein were recorded using several recording devices.  Therefore, the meetings are captured on several "1D" numbers which are cumulative.  Only the 1D numbers needed to reflect a complete recording of a meeting or relevant conversation are cited herein.

Georgia ("Georgia").  In connection with that deal, Paz explained to Morales, Godsey, and

Bistrong in a recorded conversation that he was working with a company in Georgia on the deal,

that one of the company's owners was the Minister of Defense's cousin, and that the company

would use part of its commission to "take[ ] care of who they need to take care of whenever they

need to take care of 'em."  (Recording 1D No. 196 (audio).)  Paz also explained that the

Georgian government officials who would inspect the Humvees "would need to be taken care of,

to the level of girls in the rooms at night," and Morales responded that he "understand[s]."  (Id.)

Paz later explained that the cost of this entertainment would be "$500 per night for three girls."

(Id.)

        In a separate deal, Bistrong worked with Pankesh Patel and Alvirez to sell goods to the

Guatemalan government.  When Patel learned that they were going to win the deal, Patel said

"it's a very fine line in Guatemala when you say win.  Because it's . . ." and Alvirez clarified that

"[i]t's called buying the business."  (Recording 1D No. 432 (audio).)  Patel then explained that

because the government officials responsible for awarding the deal changed during the deal

negotiation, "[Patel's sales agents in Guatemala] just have to butter them up again," they have to

"butter up, under the table, whatever you want to call it . . . they've got to basically grease them

again" and therefore the agents' profit is "blown to smithereens because . . . they'd already paid

the old guy and then the new guy's coming in so he wants to be paid as well."  (Id.)

        Bistrong also worked with defendants John Wier, Saul Mishkin, Alvirez, David Painter,

and Lee Wares on a deal to sell tanks to the Republic of Colombia ("Colombia").  In connection

with that deal, Bistrong recorded a conversation with Wier and Mishkin in which Wier explained

that Colombian government officials, both politicians and officials in the military, were asking

for money on the deal and stated, "I'll, like you said, make sure that everything gets covered."

(Recording 1D Nos. 278, 352 (audio).)  Mishkin then advised Wier on how to get money to Colombia to make sure the government officials would be paid.  (Id.)

In the third phase of his cooperation, Bistrong worked with the FBI on an undercover operation involving many of the individuals from the previous two phases of his cooperation, as well as some business associates of those individuals.  The undercover operation involved the purported sale of $15 million of military and law enforcement products to Gabon, an African country referred to as "Country A" in the Indictment, and the payment of $3 million in "commissions" to a sales agent, half of which the individuals were told would be given to Gabon's Minister of Defense in order to obtain or retain the deal.[3]  The undercover operation resulted in the instant charges against the defendants in this case.

A.     The Gabon Deal

In the summer of 2009, Bistrong and Pascal Latour, an FBI agent posing as a representative of Gabon's Minister of Defense, asked approximately 26 individuals, including each of the defendants, to participate in the Gabon deal.  The invitation to participate in the deal was recorded on audio and/or video tape.[4]  Although the description of the deal varied slightly from individual to individual, the description of the total value of the deal ($15 million), the two phases of the deal (a small test order and a larger order to follow if the "commission" was paid to

---

[3]     During the first phase of his cooperation, Bistrong explained to the government, and the recordings confirmed, that people involved in international sales in the military and law enforcement products industry frequently use the term "commission" to describe payments to foreign government officials in lieu of other terms, such as "bribe" or "kickback."

[4]     In some instances, individuals participated in the meetings by telephone or the meetings were held in locations not equipped with video recording devices and therefore some conversations, including those with defendants Mishkin, John Mushriqui, Helmie Ashible and Painter, were only captured on audio tape.

7

the Minister of Defense on the first order), the total amount of "commission" to be paid by the suppliers (20% of each supplier's portion of the $15 million deal, i.e., $3 million), and the total amount that would be given to the Minister of Defense (half of Latour's $3 million "commission," i.e., $1.5 million) was the same for all of the individuals who were invited to participate in the deal.

For example, in a recorded meeting in a hotel room in Miami, Florida on May 14, 2009, defendants Patrick Caldwell and Stephen Giordanella were told by Latour:

> Gabon has uh a Presidential Guard, which is uh, eighteen hundred troops, which is is like the uh, elite . . . . special unit that has special training, special equipment, and has [a] different mission from the rest of the armed forces of Gabon.  Uh, their mission basically is is uh, might be similar to uh what your job used to be, uh, to protect the President and his family[5] . . . . the project here is to re, uh, is to resupply the the Presidential Guard from basically from toe to uh, with some exceptions . . . . they've certified a budget of fifteen million dollars for 2009 to reequip the unit.

(Recording 1D No. 461 (video).)  Latour and Bistrong then explained how the money would flow for the deal.  Specifically, Bistrong stated that "the way this program works is it's the fifteen million dollars is the budget, but in that budget is a twenty percent commission that's built into the fifteen.  Okay, so there's three million dollars, note, that's built in . . . ."  (Id.)

Latour described:

> Latour:          . . . the twenty percent commission for Latour Conseil which, of which ten percent is for uh, for uh, [A.B.], for [A.B.], you know, the Minister of Defense . . .[6]

---

[5]     Earlier in the conversation, Caldwell explained to Latour and Bistrong that he had worked for the United States Secret Service for 32 years and that he had been in charge of the Vice President's protective detail.

[6]     In accordance with Department of Justice policy, the government refers to this individual, described as "the Minster of Defense" or "A.B.," and one other uncharged third party using pseudonyms.

| | |
|---|---|
| Giordanella: | Uh, huh. |
| Latour: | . . . and that's across the board for all the vendors.  So the, you know, he gets his cut, basically . . . |
| Giordanella: | Um, hmm. |
| Latour: | . . . and uh, and uh, we get our cut and then I'll take care of Richard out of my ten percent. |

* * * *

| | |
|---|---|
| Latour: | It's, it's kind of an obligation that I have, essentially, to [A.B.] now, with these, uh, with these, uh, with these twenty-five, or in this case, fifty units for each uh, vendor, is uh it shows him that uh he can get his commission from everybody . . . |
| Giordanella: | Right. |
| Latour: | It proves, I can prove to him that everybody is going to be paying him . . . |
| Giordanella: | You're dealing with the right people. |
| Latour: | Right, because . . . |
| Giordanella: | I got it.  Now I know why Rich wanted me to be here.  I, I got it. |
| Bistrong: | Yeah.  So that's it, it basically. |
| Giordanella: | It's all about, about doing the right thing . . . |
| Bistrong: | Sure. |
| Giordanella: | . . . and making sure everybody gets what . . . |
| Latour: | Right, right, and then the this, this way we are assured that in 2010 . . . |
| Giordanella: | We get more business. |

(Id.)

After receiving the explanation quoted above, neither Giordanella nor Caldwell raised

any concerns about the payment of $1.5 million to the Minister of Defense.  Instead, Giordanella

asked "[a]ny other products we might be able to do for you? . . . I'm talking about part of the fifteen million dollar budget." (Id.)  Additionally, after the meeting, Caldwell and Giordanella caused invoices, commissions, and goods to be sent in connection with the deal.

Similar to Caldwell and Giordanella, none of the other defendants raised concerns about the payment of $1.5 million to the Minister of Defense when Bistrong and Latour explained the Gabon deal to them in language similar to that quoted above.  Instead, the defendants readily agreed to participate in the deal and agreed to, and later did, send the requested invoices and commission payments to Bistrong and Latour.  Indeed, after being told that he would be expected to pay a 20% commission, half of which would be given to the Minister of Defense, defendant Paz said, "I'm actually surprised that it is only 20%.  On these kinds of deals where there's two, three, four hands involved, you are usually looking at 30%," to which Latour responded, "don't let [the Minister of Defense] know that because if he finds out, he's gonna ask for 20% next time."  (Recording 1D No. 536 (video).)  Similarly, after being told of the 20% commission and its purpose, defendant Wares placed his fingers in his ears and said, "I didn't hear that but I understand."  (Recording 1D No. 542 (video).)

Unlike the defendants, some individuals who were asked to participate in the deal rejected the offer because it involved a payment to the Minister of Defense.  For example, after being told that the deal involved the payment of a 20% commission to Latour, half of which Latour would give to the Minister of Defense, one individual shook his head, placed his head in his hand, appeared visibly agitated and said that what Bistrong and Latour had just explained to him was a "big problem," and that "FCPA issues are the problem."  (Recording 1D No. 545 (video).)  Notably, the payment was described to that individual in the same way as it was described to the defendants, as a "commission," part of which would be given to the Minister of

Defense.  (Id.)  Once this individual rejected the offer to participate in the deal, he was allowed, along with other individuals who rejected the offer, to walk away from the deal.

    B.    The "Critical Periods" Identified By the Defendants

    The defendants identify two "critical periods" as a "representative sample of when the government took actions that are exculpatory and/or material to a motion to dismiss." (Defendants' Motion for Evidentiary Hearing ("Defs. Mot.") at 18.)  These "critical periods" occurred at least one month (and for the second period, five months) after the defendants agreed to pay a bribe to Gabon's Minister of Defense in order to obtain business and after the defendants had taken at least one overt act in furtherance of the conspiracy.[7]  These periods involve, at most, four defendants, only three of whom joined in the defendants' motion.[8] Additionally, although the defendants cite these periods as "representative sample[s]," they are the only instances in which the defendants raise the legality of the deal with Bistrong.

        1.    Defendants Mishkin and Alvirez's Conversations with Bistrong on June 25, 2009

    The first "critical period" cited by the defendants occurred on or about June 25, 2009, and involved a series of emails and telephone conversations between Mishkin, Alvirez, and Bistrong.[9]  On June 25, 2009, approximately one month after Mishkin and Alvirez had agreed to

---

[7]    Defendant Helmie Ashible did not speak with Bistrong and Latour about the Gabon deal, or take an overt act in furtherance of the conspiracy, until August 25, 2009.

[8]    Defendant Alvirez did not join in the defendants' motion.

[9]    Although the defendants suggest that defendant Morales also raised concerns with Bistrong about whether the Gabon deal was legal during this "critical period," they fail to cite any evidence of this.  (See Defs. Mot. at 22.)  Instead, the conversations they cite demonstrate just the opposite.  For example, as Mishkin told Bistrong on June 25, 2009, Mishkin "[didn't] think [Morales] took this, uhhh, seriously.  [Morales] said 'Oh, we will check.  We have our compliance.  I can check everything with the government.  That's not a problem.'"  (Defs. Mot. at Exhibit ("Ex.") 11, Tab H at 31.)  Notably, Morales did not contact Bistrong during this

pay bribes to Gabon's Minister of Defense in order to obtain business, had sent invoices in furtherance of the deal, and had received payment for Phase One of the deal, Mishkin emailed Bistrong a letter which stated that Mishkin's company would be returning the funds received from Gabon and would not be proceeding with the Gabon deal.  Bistrong, who had spent a significant amount of time the preceding week responding to Mishkin's questions regarding the logistics of the deal and preparing documents in response to Mishkin's requests, responded that he was upset with Mishkin and that he would now have to deal with the consequences of Mishkin's actions on his relationship with Latour, who was purportedly Bistrong's long-time friend who was sourcing the Gabon deal on behalf of the Minister of Defense.

Approximately one hour after Bistrong responded to Mishkin's email, Bistrong received a call from Alvirez, who, at that time, had worked closely with Bistrong for over a year and had engaged in numerous recorded conversations with Bistrong and others in which he demonstrated knowledge of the FCPA and discussed how to structure deals so as to hide payments to government officials.  During this recorded call, Alvirez recounted that Mishkin had contacted him to tell him that Mishkin's lawyers recommended that Mishkin withdraw from the deal because the government and ruling family in Gabon were under investigation in the United States and individuals had been indicted for making payments to the ruling family.  (See Defs. Mot. Ex. 11, Tab F at 2-3.)  Alvirez asked Bistrong if they were doing anything illegal in the Gabon deal.  (See id. Tab F at 2.)  Bistrong initially responded that they were not but made it clear later in the conversation that:

> [Bistrong's] attitude on this is what Pascal has to do, Pascal has to do.  He's no

---

"critical period," or at any time, to raise concerns regarding the deal or to discuss the legality of the deal.

different than any other agent we have in the industry.  Okay?  That's my philosophy on it, so, you know.  And if Saul – I don't mind if Saul wants out of this deal.  That's fine, but don't get [ ] righteous on me.  You know what I am saying? … Especially him…I don't care.  If you don't – if you want out, but this is the guy that's telling us, you know, how much he's paying the guys in Georgia to get deals done.

(Id. Tab F at 2, Tab G at 3-4.[10])  After Bistrong explained his "philosophy," Alvirez

recommended that Bistrong call Mishkin and "try to chill him out" and also attempted to

formulate a cover story for the corrupt payments by asking Bistrong "what's our explanation for

why we sent money back to Gabon?"  (Id. Tab G at 6.)

Bistrong then called Mishkin and told Mishkin that:

The most important thing, Saul, is not only do I respect your decision not to participate in this deal but I support it because if your compliance and internal policies say this is not a deal for you, then you are doing the right thing by not participating in it.

(Id. Tab H at 2-3.)  Mishkin explained that he was withdrawing from the deal because his lawyer

had advised him not to participate in the deal.  (Id. Tab H at 11-13.)  Mishkin read Bistrong a

letter from his lawyer that purportedly stated:

I know from my own involvement in other matters that I cannot discuss, that the Government of Gabon and the family of the late President [ ], in particular, have a reputation for corrupt dealings.  Certain commercial transactions involving the Government of Gabon are currently under investigation by the U.S. Department of Justice and also by the Congressional Commission – by a Congressional Committee.  This transaction appears to have the same features as the other transaction that is currently under investigation.  The structure of this transaction and the payment of this commission may well violate the U.S. Foreign Corrupt Practices Act as well as other U.S. statutes as that relate to money laundering.

(Id. Tab H at 12-13.)  Bistrong told Mishkin that he "did the absolute right thing" by

withdrawing from the deal and that "the only thing I disagree with your with your lawyer, if

---

[10]     The conversation in Exhibit 11, Tab G is a continuation of the conversation in Exhibit 11, Tab F.  The conversation in Tab F was cut off due to the loss of cellular service and the conversation in Tab G occurred only minutes after the conversation in Tab F.

Gabon was under any Congressional investigation, the State Department would not have told me that they're going to support this license."[11]   (Id. Tab H at 13, 18.)  At no time did Bistrong tell Mishkin that he disagreed with Mishkin's lawyer's advice that "[t]he structure of this transaction and the payment of this commission may well violate the U.S. Foreign Corrupt Practices Act as well as other U.S. statutes as that relate to money laundering."

Later in that same conversation, Mishkin proposed an alternative structure for his part in the deal.  Mishkin proposed that he sell his products directly to Bistrong's company for Bistrong to then sell to Gabon.  Bistrong told Mishkin that "at the end of the day, okay, what ends up making the deal is the relationship and Pascal taking care of the minister, okay?" but that Bistrong would structure the deal to "get[ ] [Mishkin] as far away from that" as he wanted.  (Id. Tab H at 40-41.)

After Bistrong's call with Mishkin, Bistrong updated Alvirez on his conversation with Mishkin and explained that Mishkin would be proceeding with the deal but would sell his products to Bistrong's company for sale to Gabon, rather than sell them directly to Gabon.  (See id. Tab I at 9-10.)  Bistrong also explained that Mishkin had discussed his attorney's concerns with Morales earlier in the day.  Alvirez offered to call Morales and "remind him that Natalie and Daniel Alvirez paid for his wedding" and that the "two-and-a-half million dollar order he has right now is from Daniel Alvirez," but Bistrong dissuaded Alvirez from calling Morales to pressure him to stay in the deal.  (See id. Tab I at 12-14.)

> 2.   Defendant Caldwell's Conversations with Bistrong in October 2009

The second "critical period" occurred in October 2009 and involved emails and

---

[11]      At the time Bistrong made this statement, neither Bistrong nor the FBI agents supervising him were aware of a Congressional investigation into Gabon.

conversations between Caldwell, T.O., the then Vice President of International Sales at the company for which Caldwell was the Chief Executive Officer, and Bistrong.  On October 9, 2009, Bistrong called T.O. to discuss an amendment to the Phase Two contract the company had requested.  (See Defs. Mot. Ex. 11, Tab K.)  In this recorded conversation, T.O. told Bistrong that the company's lawyer had added FCPA language to the draft amendment T.O. had previously sent Bistrong and that Bistrong should have received a new draft amendment from the company.  (See id. Tab K at 5.)  Bistrong noted that he and Latour had already signed FCPA certifications for the company and that the new draft amendment was a problem because he had already sent the previous draft to Gabon for its review.[12]  (See id. Tab K at 6.)  T.O. stated that in light of that, he would talk to Caldwell and see what they could do.  (See id.)  In a subsequent conversation on October 13, 2009, Bistrong told T.O. that he would send the revised draft to Gabon once he received it and they would deal with any issues Gabon had with it at that time.[13]  (See id. Tab M at 3-4.)

On October 19, 2009, Bistrong discussed the revised amendment with Caldwell.  In

---

[12]     On June 4, 2009, Bistrong discussed the company's request for FCPA certifications with defendant Giordanella.  (See Recording No. 36308.)  Bistrong asked Giordanella, "given the discussion that we had, you know, in Miami and some of that FCPA stuff that's in there, you know, what do you think I should do?"  (Id.)  Giordanella responded, "all we're doing is giving back, um, Pascal a commission and whatever Pascal does is Pascal's business."  (Id.)  Bistrong asked Giordanella if he thought Pascal should sign the certification given that "we sort of told you what the deal was and this paperwork, you know, you understand."  Giordanella said that he did not see a problem with Pascal signing the certification and that Bistrong should just "get it done."  (Id.)

[13]     The defendants incorrectly claim that the government has not produced a recording of one of Bistrong's calls with T.O. on October 13, 2009.  The recording was produced to the defendants with the other telephone recordings but was inadvertently omitted from the folder containing calls that include or mention Caldwell and was placed in a different folder instead.

particular, Bistrong explained to Caldwell that he had a couple of issues with the FCPA clause.

(See id. Tab O at 3.)  He told Caldwell that, because the FCPA does not cover "the actual foreign

official," asking Mahmadou, an FBI agent posing as the Deputy Procurement Official for

Gabon's Ministry of Defense, to sign an FCPA certification is "asking a person to sign who is

not covered under the actual FCPA law."[14]  (Id.)  Bistrong also explained:

> Bistrong:      And you know – look, as I shared in Miami, and, you know, Pascal
>                explained that he's, you know, sharing half of his commission, you know,
>                with the, um – with the Minister of Defense, now the President of Gabon.
>
> Caldwell:      Yeah.
>
> Bistrong:      And you know, Mahmadou talked about that when, uh, we were in D.C.
>
> Caldwell:      Right.
>
> Bistrong:      So I just wanted to, you know, make sure – and again, I would have
>                waited till [T.O.] came back, but I'm trying to get all the documents
>                processed as quickly as possible.
>
> Caldwell:      Right.
>
> Bistrong:      So I just thought I would share that with you, and, you know, you let me
>                know how you want me to proceed on that basis.
>
> Caldwell:      Ok.  Let me, uh, let me talk to counsel.  Uh.  And – and so that's what
>                precipitated this whole thing Richard.  Believe me, you know –  you know
>                how it is when you get lawyers involved.  (Laughs)

(Id. Tab O at 4.)  Later that day, Caldwell called Bistrong and told him that the company's

lawyer said that there was no need for Mahmadou to sign the certification but that "she's just

looking for something that, you know, me and you, and I guess Pascal, you know, understand

that we are [subject to the FCPA].  And that's why we have to be so careful."  (Id. Tab P at 4.)

---

[14]      The FCPA does not cover the conduct of foreign officials who accept corrupt
payments.  Rather, it only applies to individuals and entities that offer to make a corrupt payment
in order to obtain or retain business.  See 15 U.S.C. §§ 78dd-1, et seq.

Bistrong stated that he would have Latour and Mahmadou sign the amendment.  (Id. Tab P at 5.)

       C.      The Reception and Arrest

Just a few days before this "critical period," on October 5, 2009, Caldwell attended a cocktail reception with the other Gabon deal participants to celebrate the completion of Phase One and to meet with Mahmadou to discuss Phase Two.[15]  At that reception, Bistrong delivered a speech discussing the Gabon deal and introduced Mahmadou as the Deputy Procurement Official for Gabon's Ministry of Defense.  After Bistrong's speech, Caldwell met separately with Bistrong and Mahmadou.  Mahmadou said, "[j]ust so you know, President [A.B.] wants me to personally thank you for the quality of the product, the delivery of the product, commissions, and expects to continue to do business in the fiscal year 2009, 2010, the procurement business."[16] (Recording 1D Nos. 585, 596 (audio).)  Bistrong gave Caldwell the purchase agreement for Phase Two of the deal and Caldwell told Mahmadou and Bistrong that he hoped they could do business together in the future.  (Id.)

Mahmadou also met separately with the other defendants at the reception and thanked each one of them on behalf of the former Minister of Defense, who was now President of Gabon, for the "commission," expressed the President's desire to continue doing business in the same manner in the future, and gave them the purchase agreements for Phase Two.  (Id.)  None of the

---

[15]     Defendants Amaro Goncalves, John Mushriqui, Jeanna Mushriqui and Jonathan Spiller did not attend the cocktail reception.  Instead, they met or spoke with Bistrong and Mahmadou separately on or about the date of the reception.  In those conversations, Mahmadou thanked Goncalves, John Mushriqui, Jeanna Mushriqui and Spiller on behalf of the Minister of Defense for the "commission" in language nearly identical to that used with the defendants who attended the reception.

[16]     Between May 2009 and October 2009, Gabon's Minister of Defense had become the President of Gabon.

defendants expressed any concerns when Mahmadou thanked them on behalf of the President for the "commissions."   Instead, their responses varied from "sure" (Caldwell) to "no problem" (Morales), "absolutely" (Bigelow), "excellent" (Cohen), "we hope so" (Ashible), or "excellent, that's wonderful, thank you" (Painter and Wares).   (Id.)   Following the reception, all of the defendants, except Giordanella who had left his company by this time, returned executed copies of the purchase agreement for Phase Two to Bistrong or Latour.

On or about January 17, 2010, the defendants traveled to Las Vegas, Nevada, where they expected to meet Gabon's new Minister of Defense and receive partial payment for Phase Two of the deal.[17]   However, instead of meeting Gabon's Minister of Defense, the defendants were arrested by FBI agents.   Following their arrests, several of the defendants gave statements to the FBI in which they admitted to knowing that Gabon's Minister of Defense was receiving money in connection with the Gabon deal.   For example, Pankesh Patel told FBI agents that he knew "that to close the deal part of [Latour's] 20 percent commission would have to go back to a Gabonese Government Official" and that if part of the commission Patel paid to Latour "went to a Gabonese Government official to close the deal, it would be illegal" but that Patel "sought to close the deal anyway knowing it would be illegal."   (Bates No. ABF-00001565-1566.)

Similarly, Lee Tolleson said "he understood that the Minister of Defense, [ ], and his family would be receiving a commission" and that "when the term 'commission' was used it meant that someone would be paid."   (Bates No. ABF-00001622.)   John Mushriqui also admitted "that he also knew about the corrupt payment made to the government of Gabon in order to facilitate the sale of . . . vests."   (Bates No. ABF-00001548.)   Alvirez admitted that "he was

---

[17]   Giordanella did not go to Las Vegas because he was not working for the company involved in the deal anymore and the company would not pay for his trip to Las Vegas.

aware that a portion of Latour's commission was going back to [A.B.'s] family as a kickback."

(Bates No. ABF-00001415.)  Goncalves told FBI agents that he "assumed" that part of the

"commission" given to Latour would be sent to Gabon's Minister of Defense and that if the

Minister did not receive his payment, Goncalves' company would not get the larger order in

Phase Two of the deal.  (Bates No. ABF-00001492-1493.)  After he spoke with FBI agents,

Goncalves called his wife from jail and told her "it was an FBI sting and I'm guilty . . . I did do

something wrong and that's why I'm in trouble."

## PROCEDURAL BACKGROUND

The government previously produced to the defendants all of the audio and video

recordings of the meetings and telephone calls between Bistrong and the defendants identified

above, along with all of the other meetings and calls recorded in the course of the undercover

investigation, and the FBI reports memorializing the defendants' post-arrest statements.  The

government also previously produced to the defendants all of the text messages it was aware

existed at the time between Bistrong and the defendants and other individuals not charged in this

case.

In addition, the government previously produced all of the text messages it was aware

existed at the time between the FBI agents and Bistrong.  The government even contacted the

wireless carriers for the telephones used by the FBI agents and Bistrong and was advised that the

carriers did not retain text messages for more than several days.  The government thereafter

subpoenaed the telephone records from the wireless telephone carriers for Bistrong and produced

them to the defendants.  Those records contain a detailed log of text messages to and from

Bistrong, including text messages with the FBI agents.

At the last status conference, defendant John Gregory Godsey raised the issue of text

messages between the FBI agents and Bistrong that had not been produced in discovery. Specifically, Godsey cited 33 text messages to and from Bistrong during a "critical time in the operation" when defendant Saul Mishkin was communicating with Bistrong about possibly withdrawing from the Gabon deal.  (Transcript of Status Conference on November 5, 2010, at 27.)

      In response to that issue, the government immediately revisited the production of text messages.  In doing so, the government had the FBI conduct a search of its servers to see if any additional text messages between the FBI agents and Bistrong could be retrieved.  The search of the FBI servers retrieved a substantial number of text messages – numbering into the thousands – between the FBI agents and Bistrong during the course of the investigation.

      The government also had the FBI conduct a search of the operational and personal handheld wireless devices used by Bistrong during the investigation.  The search revealed that all of the remaining text messages on Bistrong's operational handheld wireless devices between the FBI agents and Bistrong were captured on the recording equipment used by the FBI during the investigation and have previously been produced to the defendants.

      For Bistrong's personal handheld wireless devices, due to law enforcement concerns for the safety of Bistrong while he was working covertly in an undercover investigation, Bistrong was directed by the FBI to delete text messages between the FBI agents and Bistrong from his personal handheld wireless devices.  That way, text message communications to and from law enforcement agents would not risk the possibility of disclosing Bistrong's status as a cooperating government witness and pose a threat to his safety.[18]  A search of Bistrong's personal handheld

---

[18]    Counsel for the government was unaware of such directions when the text messages were discussed at the last status conference.  (Transcript of Status Conference on

wireless devices nevertheless retrieved approximately 57 text messages between the FBI agents and Bistrong from the investigation, 38 of which were also retrieved from the search of the FBI servers.

The government previously searched the FBI agents' handheld wireless devices used during the investigation, and in April 2010, the government produced a number of text messages between the FBI agents and Bistrong dating back to November 2009.  Text messages prior to that time from the FBI agents' handheld wireless devices, however, were no longer available because the FBI had replaced the agents' wireless handheld devices with new ones and additional text messages could not be located.

While the text messages that have now been retrieved by the FBI contain likely impeachment material, the vast majority of them do not even constitute discovery under Rule 16. Nevertheless, the government has produced, without exception, all of the retrieved text messages to the defendants.[19]  By exceeding its required disclosure obligations, the government has produced text messages constituting <u>Jencks</u> material, as well as prospective witness statements not even discoverable under the Jencks Act.

Although not every text message during the investigation has been retrieved, all of the text messages between the lead FBI case agent and Bistrong during the "critical periods" cited by the defendants in support of their motion for an evidentiary hearing – June 24-25 and October 9-28, 2009 – were retrieved in full.

November 5, 2010, at 37-41.)

[19]    In doing so, the government included in its production, in the manner they were retrieved from the FBI servers, duplicates of text messages which were sometimes captured more than once at various stages of being sent or received.  Also, where appropriate, the government made limited redactions to protect personal identification information.

DISCUSSION

As an initial matter, the defendants argue for an evidentiary hearing primarily on the grounds that during the "critical periods" the FBI agents instructed Bistrong to tell various defendants that the Gabon deal charged in the indictment was lawful, not in violation of the FCPA, and approved by the State Department.[20]  While the recordings do not support the defendants' characterization of the conversations between Bistrong and the defendants, even if that characterization were accurate, the defendants know exactly what Bistrong told them directly from the recordings of those conversations, yet they cannot mount a viable defense from that evidence.  Instructions and direction from the FBI agents to Bistrong about what to tell the defendants simply do not advance the defendants' argument where, as here, they cannot find support in the recorded conversations between Bistrong and the defendants themselves.[21]

Moreover, by arguing that the FBI agents instructed Bistrong to tell the defendants that

---

[20]     While the defendants claim that "various" defendants were affected by the objectionable conduct, in actuality, the motion identifies only four defendants – Saul Mishkin, Daniel Alvirez, Mark Morales and Patrick Caldwell – with a factual connection to the enumerated defenses.

[21]     In addition, the defendants argue that the FBI agents instructed Bistrong to try and convince at least two defendants to disregard the advice of their lawyers regarding the Gabon deal.  The defendants, however, fail even to raise an advice of counsel defense as one of the bases for their motion.  See United States v. DeFries, 129 F.3d 1293, 1308 (D.C. Cir. 1997) (the defense of advice of counsel requires the defendant to show "(1) he made full disclosure of all material facts to his attorney before receiving the advice at issue; and (2) he relied in good faith on the counsel's advice that his course of conduct was legal.").  The defendants also argue that the FBI agents directed Bistrong not to use the words "bribe" or "kickback" with the defendants. The defendants have provided no support – nor can they – for the notion that Bistrong was required to use the word "bribe" or "kickback," contrary to industry norms and common sense, when discussing payments that the participants clearly understood to be corrupt payments to a foreign official.  See, e.g., United States v. Gifford, 17 F.3d 462, 470 (1st Cir. 1994)  ("'Despite the fact that undercover operations by their nature involve elements of furtiveness, duplicity, and manipulation, we have never held that such initiatives are per se unfair.").

22

the Gabon deal was lawful, not in violation of the FCPA, and approved by the State Department, the defendants attempt to avail themselves of entrapment by estoppel, a defense that applies when a government official tells a defendant certain conduct is legal and the defendant relies on that official's statement.  Despite raising entrapment by estoppel at the status conference as the basis for their request for an evidentiary hearing – which now includes the testimony of Bistrong in addition to that of the FBI agents – the defendants fail to rely on the defense in their motion.[22] Realizing that they are precluded from raising the defense pretrial, (see Defs. Mot. at 6 n.11), the defendants unsuccessfully attempt to dress up and pass off an entrapment by estoppel defense as entrapment and outrageous government conduct.[23]  As set forth below, the result is nonetheless the same – the defendants are not entitled to an evidentiary hearing.

I.    An Evidentiary Hearing is Unwarranted on the Issue of Exculpatory Material

The defendants claim they are entitled to an evidentiary hearing based on the belief that

---

[22]      At the status conference, counsel for Godsey argued "[t]hat is the continuing efforts of the defense team to obtain information and documents which may or may not relate to Government misconduct, but certainly relate to entrapment by estoppel."  (Transcript of Status Conference on November 5, 2010, at 20.)  Counsel for Godsey later argued, "[T]he bottom line to the thing is that, as is the hallmark of entrapment by estoppel, a blatant effort by Bistrong to tell this young man . . . don't worry its all okay."  (Id. at 25.)  Likewise, in their status report to the Court dated October 29, 2010, the defendants indicate that they intend to file a motion to dismiss the indictment on the basis of entrapment by estoppel.  (See Defendants' Status Report (Docket Entry No. 190) at 14.)

[23]      Entrapment by estoppel differs markedly from traditional entrapment.  See United States v. Corso, 20 F.3d 521, 528 n.6 (2d Cir. 1994).  Entrapment by estoppel rests on a due process theory which focuses on the conduct of the government officials rather than on the defendant's state of mind, as is the case with traditional entrapment.  See United States v. Blood, 435 F.3d 612, 626 (6th Cir. 2006); United States v. George, 386 F.3d 383, 399 (2d Cir. 2004); United States v. Batterjee, 361 F.3d 1210, 1218 (9th Cir. 2004); United States v. Hedges, 912 F.2d 1397, 1405 (11th Cir. 1990).  "The entrapment by estoppel defense recognizes that even though the government may have proved all of the elements of a crime, to convict the defendant for acts committed in reasonable reliance on a government official's statement would violate due process or fundamental fairness."  George, 386 F.3d at 399.

there must be exculpatory material in the instructions and direction communicated by the FBI agents to Bistrong that has not been disclosed by the government.[24]  (See Defs. Mot. 3-7.)  The defendants' belief, however, is not supported by the law or the facts.

The government is aware of its obligation to produce exculpatory material regardless of its form.  The government has reviewed all of the documents, recordings and other information in its possession relating to the instructions and direction of Bistrong, except for certain search warrant materials under review by a filter team.  The government has also discussed with the FBI agents the substance of any instructions, direction or other communications, whether written or oral, between the FBI agents and Bistrong.

In complying with that obligation, the government has produced extremely thorough discovery – including every recording made during the investigation regardless of the identity of the participants or the relevance or materiality to the charges in the case – so the defendants can conduct their own review and make their own evidentiary assessments.  In making that assessment, the defendants contend that communications during two "critical periods" – June 24-25, 2009, when Mishkin was discussing withdrawing from the Gabon deal and October 9-28, 2009, when Caldwell was seeking to add FCPA language to the Phase Two contract – contain exculpatory material.

While the government has a different view of the facts – a subject ultimately left for trial – it has produced the recorded conversations between Bistrong, Mishkin and Caldwell for the "critical periods."  Thus, it is without dispute that the defendants are "aware of the essential facts

---

[24]     Despite joining the motion for an evidentiary hearing, defendant John Wier also filed a separate motion for exculpatory and impeachment evidence, to which the same arguments herein apply.  (See Docket Entry No. 204.)

that would enable [them] to take advantage of the exculpatory evidence." Spirko v. Mitchell, 368 F.3d 603, 609 (6th Cir. 2004) (quoting United States v. Todd, 920 F.2d 399, 405 (6th Cir. 1990)); see Conley v. United States, 323 F.3d 7, 30 (1st Cir. 2003) ("Brady does not protect a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue."); United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (citation omitted); United States v. Perdomo, 929 F.2d 967, 973 (3d Cir. 1991) (same); United States v. Blackley, 986 F. Supp. 600, 604 (D.D.C. 1997) (citation omitted) (same).  As is abundantly clear from their motion, the defendants have all of the recorded telephone calls and emails between Bistrong and Mishkin and Caldwell, which provide a detailed explanation of the events.  Indeed, Mishkin and Caldwell were the original sources of that information with first-hand knowledge of any and all communications with Bistrong, and thus they are well-positioned to take advantage of that information at trial.  See United States v. Derr, 990 F.2d 1330, 1335 (D.C. Cir. 1993) ("Brady only requires disclosure of information unknown to the defendant."); United States v. Coker, 514 F.3d 562, 570 (6th Cir. 2007) (citation omitted) (Brady does not apply "when the information is readily available to the defense from another source"); United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (quoting United States v. Davis, 787 F.2d 1501, 1505 (11th Cir. 1986)) (same); United States v. Newman, 849 F.2d 156, 161 (5th Cir. 1988) ("the government is not obligated to furnish information that is fully available to the defendant or that could be obtained through reasonable diligence.").

     In any event, the government has retrieved and produced all of the text messages between the lead FBI agent and Bistrong during June 24-25, 2009, and October 9-28, 2009.  As a result,

the defendants have all of the requested text messages between the lead FBI agent and Bistrong during the "critical periods" cited in their motion and they are free to make their own evidentiary assessments of that material.[25]

## II.    An Evidentiary Hearing is Unwarranted on the Issue of Entrapment

The defendants argue that they need an evidentiary hearing to obtain evidence to support a motion to dismiss the indictment on the grounds of entrapment.  Specifically, the defendants seek a "pre-trial examination of Bistrong and his FBI handlers to ascertain whether Bistrong was instructed to avoid making plain to his targets that he was enlisting their participation in illegal conduct."  (Defs. Mot. at 12-13.)  The defendants' argument and their requested relief is foreclosed by controlling precedent which establishes that entrapment is an issue for the jury after hearing all of the evidence at trial.  The defendants already have the very evidence for any entrapment defense at trial – the recorded conversations between Richard Bistrong and the defendants.  An evidentiary hearing would not assist in ripening that defense, which will involve a fact-bound jury determination involving state-of-mind and intent issues for each defendant.

A defendant raising entrapment "bears the initial burden of showing government inducement; if he is successful, the burden then shifts to the government to prove that the defendant was predisposed to commit the crime."  <u>United States v. Glover</u>, 153 F.3d 749, 754

---

[25]        A review of the retrieved text messages reveals that, not withstanding their potential impeachment value, they are not materially inconsistent with the recorded conversations.  For example, the text messages sent from the lead FBI agent to Bistrong during one of the "critical periods" identified by the defendants – while Bistrong was on the telephone with Mishkin on June 25, 2009 (<u>see</u> Defs. Mot. Ex. 11 at 13 & Tab E at RB 8543) – show that Bistrong substantially followed the instructions and direction communicated in those text messages by the lead FBI agent, including, "Let him talk!!!" "Dispel his concerns and offer to send docs," "Calm down," "Can still give docs if you want," "As long as you understand that Pascal still has to take care of the minister," and "And I will get pascal his money for the minister."

(D.C. Cir. 1998).  "Only when the accused satisfies an entry-level burden of production as to both elements is the government put to its burden of proving beyond a reasonable doubt that no entrapment occurred.  By like token, unless and until a defendant carries his entry-level burden, he is not entitled to his instruction."  United States v. Sanchez-Berrios, 424 F.3d 65, 76 (D.C. Cir. 2005).

In their request for an evidentiary hearing, the defendants seek pretrial resolution of these questions, but Rule 12(b) of the Federal Rules of Criminal Procedure only allows for pretrial resolution of matters "capable of determination without the trial of the general issue" – whether the defendant is guilty of the offense charged.  Construing that rule, the Supreme Court has discouraged pretrial resolution of an affirmative defense that is related to a defendant's intent.  See United States v. Knox, 396 U.S. 77, 83 (1969).  Accordingly, "[t]he question of entrapment is generally one for the jury, rather than for the court."  United States v. Mathews, 485 U.S. 58, 63 (1988); see also Glover, 153 F.3d at 754 (same).  This is because "[t]he question of entrapment . . . raises the issue of whether the criminal intent originated with the defendant or with the government's agents."  United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991); see also United States v. Santiago-Godinez, 12 F.3d 722, 727 (7th Cir. 1993) ("[W]hether or not an entrapment defense is available to a defendant is typically not amendable to pretrial resolution.  This is because whether entrapment occurred is a factual issue; the defense of which is intertwined with the issue of intent and is often based on credibility determinations, which are typically reserved for jury resolution.").[26]

---

[26]    At least one defendant has conceded as much at a status conference: "In terms of the entrapment defense, the entrapment defense in my view is a very fa[c]t intensive defense." (Transcript of Status Conference on September 27, 2010, at 49-50 (Defendant Amaro Goncalves).)

27

The defendants cite no cases where a court in this district or elsewhere has found entrapment as a matter of law pretrial.  See United States v. Rippy, 606 F.2d 1150, 1154 (D.C. Cir. 1979) (affirming district court's refusal to consider entrapment pretrial because "[e]ntrapment as a matter of law is established only where the testimony is undisputed that a person having no predisposition to commit offenses of the kind complained of was induced to do so by the trickery, persuasion, or fraud of a Government agent."); United States v. Fadel, 844 F.2d 1425, 1431 (10th Cir. 1988) (noting "[t]he vast majority of courts which have considered the issue" disfavor pretrial resolution of entrapment defense motions because "district courts are [ ] understandably reluctant to hold, prior to trial, mini-trials devoted to issues of intent and inducement").

In those rare instances of pretrial resolution of entrapment motions, courts have typically foreclosed the defense from raising entrapment at trial because of uncontradicted evidence that there had been no inducement.  See, e.g., Santiago-Godinez, 12 F.3d at 727 ("[W]here the evidence proffered in response to a motion in limine raised by the government is insufficient as a matter of law to support the affirmative defense, a pretrial ruling precluding the presentation of the defense at trial may be appropriate.").  As the recordings in this case will demonstrate, each and every defendant readily agreed to participate – and did in fact participate – in a corrupt deal, effectively disabling the defendants from making even a threshold showing of inducement.  See United States v. Whoie, 925 F.2d 1481 (D.C. Cir. 1991) ("Merely afford[ing] opportunities or facilities for the commission of the offense" is not inducement) (citing United States v. Russell, 411 U.S. 423, 435 (1973)).  Moreover, a defendant's ready acceptance of a corrupt deal can alone establish predisposition.  See United States v. Jenrette, 744 F.2d 817, 822 (D.C. Cir. 1984) (finding defendant predisposed to commit crime because he "readily responded to the

28

government's bribe" even though the congressman initially refused to take the money); United States v. Kelly, 748 F.2d 691, 698 (D.C. Cir. 1984) (finding defendant predisposed to commit crime despite no evidence that defendant had previously accepted a bribe because there was "copious" evidence of the defendant's predisposition from the videotape of the very meeting at which the defendant accepted the bribe).

While the defendants cite conversations between Bistrong and defendants Saul Mishkin and Patrick Caldwell discussing the FCPA and the legality of the Gabon deal, they fail to explain how these conversations impact their need for an evidentiary hearing, other than perhaps to suggest (incorrectly) that there is something wrong or untoward with government agents posing as criminals in an effort to ferret out crime.  It is well-settled that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises," United States v. Walls, 70 F.3d 1323, 1329 (D.C. Cir. 1995), and "[t]he Supreme Court has warned against using an entrapment defense to control law enforcement practices of which a court might disapprove." Id. (citing Russell, 411 U.S. at 435).

In any event, none of the conversations cited by the defendants remotely establish entrapment; to the contrary, all of the defendants who participated in those conversations had already agreed to participate in the corrupt deal before the conversations took place.  Moreover, the defendants now have the text messages between the FBI agents and Bistrong that show the instructions and direction given to Bistrong at the time of the cited conversations with Mishkin and Caldwell.  Because an evidentiary hearing will in no way legitimately inform or ripen the defendants' anticipated entrapment motion, the Court should reject the requested relief.

III.    An Evidentiary Hearing is Unwarranted on the Issue of Outrageous Government Conduct

The defendants claim that evidence obtained in a pretrial hearing will support a motion to

dismiss the indictment based on outrageous government conduct.  (<u>See</u> Defs. Mot. at 7-9.)  The defendants have not shown, nor can they, how the instructions and direction the FBI agents communicated to Bistrong, which they contend would be elicited at an evidentiary hearing, could conceivably support such a claim.  Accordingly, their motion should be denied.

As a threshold matter, the defendants have greatly understated the high standard required to sustain a motion to dismiss for outrageous government conduct.  In fact, "there is no binding Supreme Court authority recognizing a defense based solely upon an objective assessment of the government's conduct inducing the commission of crimes."  <u>United States v. Tucker</u>, 28 F.3d 1420, 1426 (6th Cir. 1994).  The defendants have cited no case law from this or any other jurisdiction where a federal court of appeals has upheld a finding of outrageous government conduct in circumstances similar to this case.  They also have failed to set forth the standard for such claims in the D.C. Circuit, and have ignored a wealth of binding authority in this jurisdiction that undermines their motion.[27]

In the D.C. Circuit, a motion to dismiss based on outrageous government conduct must be denied "absent 'coercion, violence or brutality to the person.'"  <u>United States v. Kelly</u>, 707 F.2d 1460, 1474 & 1477 (D.C. Cir. 1983) (reversing dismissal of charges arising from <u>Abscam</u> corruption investigation; finding government's actions "did not involve the infliction of pain or physical or psychological coercion.") (quoting <u>Irvine v. California</u>, 347 U.S. 128, 132-33

---

[27]        The D.C. Circuit has questioned the "vitality" of the doctrine of outrageous government conduct.  <u>See</u> <u>United States v. Walls</u>, 70 F.3d 1323, 1329-30 & n.3 (D.C. Cir. 1995) (observing that other federal circuits have either "rejected the defense altogether" or "seriously questioned" it); <u>United States v. Hsia</u>, 81 F. Supp. 2d 7, 19 (D.D.C. 2000)("[a]lthough defendants often invoke the doctrine of outrageous government conduct as a defense, courts have rejected its application with almost monotonous regularity.") (internal quotation marks and citations omitted).

(1954)); see United States v. Nicely, 922 F.2d 850, 860 (D.C. Cir. 1991) ("only a rare instance of police overinvolvement (physical or psychological coercion that shocks the conscience) would violate due process.") (quoting Kelly, 707 F.2d at 1476 & n.13 (internal quotation marks omitted)).  The doctrine of outrageous government conduct is not "established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police."  Kelly, 707 F.2d at 1476.

In this case, the defendants cannot show that the government's conduct reached a level considered so outrageous as measured by the high standard for such conduct in the D.C. Circuit that prosecution would be barred by principles of due process.  The defendants also cannot show how a pretrial evidentiary hearing could possibly lead to evidence of outrageous government conduct, especially when all of the charged conduct was preserved on recordings.  See United States v. Myers, 527 F. Supp. 1206, 1229-30 (E.D.N.Y. 1981) (noting, in Abscam-related prosecution, that witness credibility "was virtually eliminated from these trials" because "the essence of the government's case" was recorded).  If actionable outrageous government conduct had occurred, it would be present on the recordings of Bistrong's conversations with the defendants.

In United States v. Jenrette, 744 F.2d 817, 825 & n.14 (D.C. Cir. 1984), a case arising from the Abscam corruption investigation, the defendant claimed on appeal that the government had failed to disclose allegedly exculpatory evidence concerning the conduct of the investigation.  The court, in rejecting this claim, observed that "FBI conduct that does not inflict pain or physical or psychological coercion does not constitute a due process violation," and as such "the undisclosed evidence . . . could not have established a due process violation."  Here, as in Jenrette, interactions strictly between the FBI agents and Bistrong cannot sustain a claim of

31

outrageous government conduct.

In Nicely, a case involving an undercover agent's "ambiguous threats" directed at a defendant, the court stated, "because the [undercover agent's] threats did not arise until after most of the overt acts involving the currency reporting conspiracy were completed, they would provide no basis for overturning [defendant's] conviction" on the ground of outrageous government conduct. Nicely, 922 F.2d at 860. Like Nicely, most, if not all, of the alleged misconduct in this case occurred well into the commission of the charged offenses, and after the defendants had already committed a substantial number of overt acts in furtherance of the scheme.

In sum, if the government or its agents had acted outrageously in the investigation, the defendants would already have all the evidence needed to file a motion to dismiss the indictment. That they cannot meet the heavy burden required to obtain a dismissal does not reflect a failure by the government to produce exculpatory evidence, rather it shows that the government's conduct simply was not outrageous, and no amount of evidence at a hearing would remedy that defect in the defendants' claim.

IV.     An Evidentiary Hearing is Unwarranted on the Issue of Inherent Supervisory Powers

Relying exclusively on Ninth Circuit precedent, the defendants claim there exists grounds to dismiss the indictment based on the court's inherent supervisory powers. (See Defs. Mot. 9-10.) The defendants, however, provide no example of a court exercising its supervisory powers to dismiss an indictment, especially like here at the pretrial stage. Absent any binding or persuasive authority, defendants cannot establish that such an extreme remedy, even with the benefit of an evidentiary hearing, is appropriate.

Even in the extremely limited and extraordinary circumstances recognized by the Ninth

32

Circuit, a court may dismiss an indictment under its supervisory powers only: (1) in a case where the defendant suffers "substantial prejudice," and (2) where "no lesser remedial action is available." United States v. Chapman, 524 F.3d 1073, 1087 (9th Cir. 2008) (citations and internal quotation marks omitted); see United States v. Struckman, 611 F.3d 560, 575-77 (9th Cir. 2010). In Struckman, the court stated that, in instances of alleged violations of constitutional or statutory rights, the court should not dismiss an indictment based on its inherent supervisory powers unless the defendant has been prejudiced and "no lesser remedial action is available." Struckman, 611 F.3d at 575 (quoting United States v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991)). Absent a constitutional or statutory violation, the court's supervisory powers are even more limited, requiring evidence of flagrant prosecutorial misconduct. See id. at 576 (finding no authority "to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation.") (quoting Barrera-Moreno, 951 F.2d at 1092).[28]

In Struckman, the court upheld the trial court's denial of a motion to dismiss the indictment, notwithstanding the trial court's finding that the government had "committed serious Brady/Giglio violations." Id. at 570; see also United States v. Darui, 614 F. Supp. 2d 25, 36-38 (D.D.C. 2009) (acknowledging Ninth Circuit case law supportive of the court's supervisory power to dismiss indictment, but denying motion to dismiss based on "spotty allegations" that prosecutors had knowingly introduced perjured testimony at trial).

In this case, for the reasons set forth above concerning the claim of outrageous

---

[28]     The court explained, "The supervisory power comprehends authority for the courts to supervise their own affairs, not the affairs of the other branches; rarely, if ever, will judicial integrity be threatened by conduct outside the courtroom that does not violate a federal statute, the Constitution or a procedural rule." Struckman, 611 F.3d at 576 (citation omitted).

government conduct, the defendants cannot meet the extraordinarily high standard for dismissing an indictment based on the court's inherent supervisory powers, even with an evidentiary hearing.  To the extent the defendants seek to challenge how the investigation was conducted, such as what the FBI agents instructed or directed Bistrong to say to the defendants, that pertains to out-of-court conduct of the executive branch, which does not affect judicial integrity. Therefore, absent a constitutional or statutory violation, there simply is no basis for dismissing the indictment based on the conduct of the investigation.

The defendants' efforts to cast their allegations as a constitutional or statutory violation also fail.  The defendants cannot show a constitutional or statutory violation implicating the court's supervisory powers based on an alleged deprivation of advice of counsel.  The defendants rely on the claim that Bistrong told a couple of the defendants that the Gabon deal was legal, that the FCPA did not apply, and that it was approved by the State Department.  The defendants, however, make no effort to establish how Bistrong's statements could be said to have violated a right to advice of counsel of those defendants, let alone how such a violation could be imputed to other defendants.  Nor do the defendants attempt to demonstrate how such a violation would implicate a recognized constitutional or statutory right.  Significantly, not a single defendant has raised an advice of counsel defense in support of their motion.  Perhaps more importantly, the defendants cannot show how an evidentiary hearing relating to the FBI agents' instructions or direction to Bistrong would advance their argument when they already know exactly what Bistrong told them from the recordings.

The defendants also cannot show a constitutional or statutory violation implicating the court's supervisory powers based on the alleged destruction of exculpatory evidence.  The defendants fall well-short of meeting the exceedingly high standard for such a claim and cannot

34

satisfy it through the requested testimony of the FBI agents and Bistrong at an evidentiary hearing.  As addressed above, the government did not destroy exculpatory evidence.  To the extent there is any exculpatory material that would arguably support one of the defendants' defenses, it is in the recorded conversations between Bistrong and the defendants, which have been produced to the defendants.  Any additional material in the form of text messages or other communications from the FBI agents to Bistrong would not have the effect of converting those conversations into exculpatory material.  In any case, the defendants now have all of the requested text messages between the lead FBI agent and Bistrong during the "critical periods" cited in their motion, in addition to thousands of other text messages between the FBI agents and Bistrong, so they can make their own evidentiary assessment.

V.     An Evidentiary Hearing is Unwarranted on the Issue of Spoliation

The defendants argue that "[a] court may [ ] dismiss an indictment for spoliation of evidence," and suggest that a pretrial hearing is required to support a motion on this basis. (Defs. Mot. at 10-11.)  The defendants cite no cases where a court has ever granted this extraordinary relief at any stage of the proceedings, and they have articulated no basis for a pretrial claim that their due process rights have been violated here.  Accordingly, their motion should be denied.

To obtain dismissal on spoliation grounds, the defendants would be required to demonstrate: (1) that evidence was destroyed and it was of such a nature that the defendants would be unable to obtain comparable evidence by other reasonably available means; (2) that the government acted in bad faith; and (3) that the "evidence [possessed] an exculpatory value that was apparent before the evidence was destroyed. . . ."  California v. Trombetta, 467 U.S. 479, 488-89 (1984); see Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988).  Even where the

destruction of evidence "might conceivably have contributed to [defendants'] defenses" at trial, there is no due process violation where "the chances are extremely low that preserved [evidence] would have been exculpatory." Trombetta, 467 U.S. at 489.

The defendants fail to explain how they would establish the required elements or how an evidentiary hearing would aid in their claim. First, the government did not destroy evidence to prevent its use at trial. As explained above, text messages from Bistrong's personal handheld wireless device were deleted for witness safety reasons and text messages from the FBI agents' handheld wireless devices were not captured after the devices were replaced. The government has now recovered a substantial number of the text messages between the FBI agents and Bistrong, including all of the text messages between the lead FBI agent and Bistrong during the "critical periods" cited by the defendants. Even if the text messages had been intentionally destroyed, the defendants are not "without alternative means of demonstrating their innocence," including the recordings of meetings and telephone calls between the defendants and Bistrong and cross-examination of the FBI agents and Bistrong about their communications. See United States v. Pearl, 324 F.3d 1210, 1215 (10th Cir. 2003) (no due process violation and no abuse of discretion for failing to hold evidentiary hearing where email messages between law enforcement and cooperating witness during undercover investigation were deleted because recovery of "all or virtually all" of the emails constituted "comparable evidence" under Trombetta, and "defense counsel had an adequate opportunity to cross examine [the law enforcement officer] concerning the deleted e-mail messages and to raise the entrapment defense before the jury.").

Second, there was no bad faith on the part of the government. "[T]he mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish

bad faith."  United States v. Richard, 969 F.2d 849, 853-54 (10th Cir. 1992); see United States v.

Zambrana, 841 F.2d 1320, 1343 (7th Cir. 1988) (explaining, "[a]lthough defense counsel asserts

that the government was in control of the evidence and failed to preserve it properly, this alone is

insufficient to establish bad faith.").  Any claims of bad faith are effectively countered by the

fact that the government has recovered and disclosed the very text messages between the lead

FBI agent and Bistrong that the defendants assert will form the basis for their motion to dismiss.

See United States v. Parker, 72 F.3d 1444, 1452 (10th Cir. 1995) (explaining that mere

negligence on the government's part in failing to preserve evidence is inadequate for a showing

of bad faith); United States v. Femia, 9 F.3d 990, 995 (1st Cir. 1993) (finding that even gross

negligence is not equivalent to bad faith); United States v. Brown, 9 F.3d 907, 910 (11th Cir.

1993) (conclusory statement that law enforcement acted in bad faith is insufficient to support a

due process claim for destruction of evidence).

　　　　Third, the defendants now have the recovered text messages, and there is basis to

conclude that additional text messages would be materially different from the thousands that the

government has already produced.  The defendants' bald statement that conversations between

government agents and a cooperating witness constitute exculpatory material does not make

them so.  See United States v. Haire, 371 F.3d 833, 841 (D.C. Cir. 2004) (citing United States v.

Williams-Davis, 90 F.3d 490, 514 (D.C. Cir. 1996) ("It is unwise to infer the existence of Brady

material based on speculation alone.") (citation omitted)).  The defendants will have ample

means with which to cross-examine Bistrong and the FBI agents, and they will be free to argue

at trial, if properly supported in the record, that any missing text messages would have

exonerated the defendants.

　　　　The defendants' reliance on United States v. Suarez, No. 09-932 (JLL), 2010 WL

4226524 (D.N.J. Oct. 21, 2010), is misplaced as it does not support their entitlement to a pretrial evidentiary hearing.  As an initial matter, the court in <u>Suarez</u> held an evidentiary hearing during trial, not at the pretrial discovery stage.  <u>See</u> <u>id.</u> at *1-2.  In fact, the court only considered remedial relief at the close of evidence.  Here, the government has supplied the defendants – well before any trial in this case – with all of the text messages between the lead FBI agent and Bistrong during the "critical periods" cited by the defendants, as well as thousands of text messages from the entire undercover operation.  The defendants certainly may attempt to make spoliation arguments based on the absence of text messages or any other information at trial, but <u>Suarez</u> does not sanction the pretrial remedy sought here.

Further, the court in <u>Suarez</u> held an evidentiary hearing for the sole purpose of resolving why certain text messages were not retained and not, as the defendants seek here, for "the substance of any direction given to or discussion with Bistrong that is exculpatory and/or relevant to a pre-trial motion to dismiss the indictment."  (Defs. Mot. at 4.)  The <u>Suarez</u> court did not consider a motion to dismiss based on missing evidence and even rejected the defendants' motion to suppress evidence relating to the cooperating witness.  Specifically, the court found that the government did not lose or destroy the text messages in bad faith.  <u>See</u> <u>id.</u> at *7, 9.

In addition, the <u>Suarez</u> court did not find that missing text messages between agents and a cooperating witness constitute exculpatory material.  <u>See</u> <u>id.</u> at *7.  Indeed, the court found that text messages from the FBI agents to the cooperating witness did not even constitute discovery under Rule 16.  <u>See</u> <u>id.</u> at *4.  Instead, the court ruled that the text messages triggered the government's disclosure obligations under the Jencks Act.  <u>See</u> <u>id.</u> at *5-6.  It was then not until the court heard all of the evidence at trial that it decided an adverse inference instruction was warranted under the circumstances.  <u>See</u> <u>id.</u> at *7-10.

Given the present posture of this case, and in view of the government's disclosures of the text messages well in advance of trial, there is no basis to hold a pretrial evidentiary hearing to inform a motion to dismiss based on spoliation.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the defendants' request for a pretrial evidentiary hearing.

Respectfully submitted,

DENIS J. McINERNEY                    RONALD C. MACHEN JR.
Chief, Fraud Section                  United States Attorney
                                      In and For the District of Columbia


By:      _____/s/_____                  _____/s/_____
       LAURA N. PERKINS                      MATTHEW C. SOLOMON
       D.C. Bar # 479048                     NY Bar # 3055209
       JOEY LIPTON                           JONATHAN HARAY
       IL Bar # 6225473                      D.C. Bar # 480140
       AMANDA AIKMAN                          Assistant United States Attorneys
       VA Bar # 76456                         Fraud & Public Corruption Section
       Trial Attorneys                        United States Attorney's Office
       Criminal Division, Fraud Section       555 4th Street, N.W.
       U.S. Department of Justice             Washington, D.C. 20530
       1400 New York Avenue, N.W.             (202) 514-7566
       Washington, D.C. 20530
       (202) 514-7023